Slip Op. 09-83

## UNITED STATES COURT OF INTERNATIONAL TRADE

---

|  |  |  |
|---|---|---|
| QINGDAO TAIFA GROUP CO., LTD., | : | |
| Plaintiff, | : | |
| v. | : | Before: Jane A. Restani, Chief Judge |
| UNITED STATES, | : | Court No. 08-00245 |
| Defendant, | : | **Public Version** |
| and | : | |
| GLEASON INDUSTRIAL PRODUCTS, INC. and PRECISION PRODUCTS, INC., | : | |
| Defendant-Intervenors. | : | |

---

## <u>OPINION</u>

[Plaintiff's motion for judgment on the agency record granted in part; remanded to Department of Commerce regarding government control of plaintiff.]

Dated: August 11, 2009

Adduci, Mastriani & Schaumberg, LLP (Louis S. Mastriani and William C. Sjoberg) for the plaintiff.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Stephen C. Tosini); Irene H. Chen, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for the defendant.

Crowell & Moring LLP (Matthew P. Jaffe and Alexander H. Schaefer) for the defendant-intervenors.

Restani, Chief Judge: This matter is before the court on plaintiff Qingdao Taifa

Group Co., Ltd.'s ("Taifa") motion for judgment on the agency record pursuant to USCIT Rule

56.2. Taifa, a Chinese manufacturer of hand trucks and parts thereof, challenges the final

determination of the United States Department of Commerce ("Commerce") in the

administrative review of the antidumping duty order on hand trucks and certain parts thereof

from the People's Republic of China ("PRC"), which assigned Taifa the PRC-wide dumping

margin based on total adverse facts available ("AFA").  See Hand Trucks and Certain Parts

Thereof from the People's Republic of China; Final Results of 2005-2006 Administrative

Review, 73 Fed. Reg. 43,684 (Dep't Commerce July 28, 2008) ("Final Results").  For the

reasons stated below, the court sustains Commerce's final determination in part and rejects it in

part, and this matter will be remanded to the Department of Commerce to consider the

appropriate AFA margin.

## BACKGROUND

In 2004, Commerce issued an antidumping duty order on hand trucks and certain

parts thereof from the PRC.  See Notice of Antidumping Duty Order: Hand Trucks and Certain

Parts Thereof From the People's Republic of China, 69 Fed. Reg. 70,122 (Dep't Commerce Dec.

2, 2004) ("AD Order").  The AD Order applies to "assembled or unassembled" hand trucks and

defines a "complete or fully assembled hand truck" as having "at least two wheels" but excludes

"wheels and tires used in the manufacture of hand trucks."  Id. at 70,122.  Commerce determined

that Taifa's individual weighted-average dumping margin was 26.49%, as opposed to the PRC-

wide rate of 383.60%.  Id. at 70,123.  Commerce received requests for administrative reviews of

the AD Order for Taifa and other exporters for the period December 1, 2005, through November

30, 2006, and Commerce initiated a review in February 2007.  See Initiation of Antidumping and

Countervailing Duty Administrative Reviews and Request for Revocation in Part, 72 Fed. Reg.

5005 (Dep't Commerce Feb. 2, 2007).

Taifa, the sole mandatory respondent, Hand Trucks and Certain Parts Thereof from the People's Republic of China; Preliminary Results, Partial Intent to Rescind and Partial Rescission of the 2005-06 Administrative Review, 73 Fed. Reg. 2214, 2214 (Dep't Commerce Jan. 14, 2008) ("Preliminary Results"), submitted a separate rate certification and responses to Commerce's questionnaires stating that the government did not control or own any interest in Taifa during the period of review ("POR") (see App. of Docs. in Supp. of Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on the Agency R. ("Pl.'s App.") Tab 1; Def.'s App. 13, 64; Def.-Intervenors' App. to Mem. of P. & A. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("Def.-Intervenors' App.") Tab 3, at 2–3). Domestic producers Gleason Industrial Products, Inc. ("Gleason") and Precision Products, Inc. ("Precision"), defendant-intervenors here, submitted documents indicating that the Yinzhu Town Government owned a majority interest in Taifa. (See Def.-Intervenors' App. Tab 6.) Taifa also stated in its questionnaire responses that it did not sell wheels with its hand trucks and therefore did not report any factors of production ("FOP") data for wheels. (See Def.'s App. 41, 56.) Commerce's Preliminary Results, issued in January 2008, applied an individual weighted-average dumping margin of 3.82% for Taifa, while the PRC-wide rate was 383.60%. Preliminary Results, 73 Fed. Reg. at 2222.

Commerce conducted verification of Taifa from April 15 to April 18, 2008, and issued its verification report on June 12, 2008. (Def.'s App. 81.) According to the report, Commerce found production notices for subject merchandise that referenced wheels, and a Taifa manager admitted that Taifa sold hand trucks and wheels together but did not attach the wheels to avoid duties under the AD Order. (Id. at 93.) The report also stated that although Taifa officials said that they had destroyed Taifa's production notices and factory-out slips, Commerce

found the documents, and that Taifa employees attempted to remove and hide pages from the

current production subledger.  (<u>Id.</u> at 91–93.)  Finally, the report stated that some documents

indicated that a collective called Qingdao Taifa Group Co. owned a majority of Taifa's shares,

but other documents indicated that the Yinzhu Town Government owned those shares, and that

documents reflecting a 2003 transfer of the majority interest to other individuals were not

registered.  (<u>Id.</u> at 83–87.)   Commerce found no other evidence of government control.  (<u>Id.</u> at

88.)

        In two memoranda issued on July 14, 2008, Commerce concluded that it would

apply total AFA based on the information in the verification report.  <u>See</u> <u>Issues and Decision</u>

<u>Memorandum for the Antidumping Duty Administrative Review of Hand Trucks and Certain</u>

<u>Parts Thereof from the People's Republic of China</u>, A-570-891, POR 12/01/2005-11/30/2006, at

6 (July 14, 2008) ("<u>Issues and Decision Memorandum</u>"), <u>available at</u>

http://ia.ita.doc.gov/frn/summary/PRC/E8-17252-1.pdf; <u>Application of Adverse Facts Available</u>

<u>for Qingdao Taifa Group Import and Export Co., Ltd. and Qingdao Taifa Group Co., Ltd. in the</u>

<u>Review of Hand Trucks and Certain Parts Thereof From the People's Republic of China</u>, A-570-

891, POR 12/01/05-11/30/06, at 11 (July 14, 2008) ("<u>AFA Memorandum</u>"), <u>available at</u> Pl.'s

App. Tab 6.  In its July 28, 2008, <u>Final Results</u>, Commerce determined that Taifa failed to

cooperate with the review, applied total AFA, denied Taifa a separate rate, and assigned Taifa

the PRC-wide margin of 383.60%.  <u>Final Results</u>, 73 Fed. Reg. at 43,686–88.  Taifa now

challenges the <u>Final Results</u>.

<b>JURISDICTION AND STANDARD OF REVIEW</b>

        The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will uphold

Commerce's final determination in an antidumping investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.       Exhaustion of administrative remedies

Preliminarily, the Government argues that the court should not consider Taifa's claims because Taifa failed to exhaust its administrative remedies.  (Def.'s Resp. to Taifa's Mot. for J. Upon the Administrative R. 10–12.)  The Government contends that Taifa should have addressed the application of AFA and the PRC-wide rate before Commerce by filing a case brief, explaining its actions during verification, commenting on the verification report, or responding to Gleason's case brief, which argued that Commerce should apply total AFA based on Taifa's actions during verification.  (Id.)  The Government's argument is unavailing.

The court "shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  To exhaust its administrative remedies, a party usually must submit a case brief "present[ing] all arguments that continue in [its] view to be relevant to [Commerce's] final determination or final results."  19 C.F.R. § 351.309(c)(2); see Nakornthai Strip Mill Pub. Co. v. United States, 558 F. Supp. 2d 1319, 1329 (CIT 2008).  A party, however, may seek judicial review of an issue that it did not raise in a case brief if Commerce did not address the issue until its final decision, because in such a circumstance the party would not have had a full and fair opportunity to raise the issue at the administrative level.  LTV Steel Co. v. United States, 985 F. Supp. 95, 120 (CIT 1997).

Here, the January 2008 Preliminary Results applied a low, separate rate of 3.82%

for Taifa and did not rely on AFA.  See Preliminary Results, 73 Fed. Reg. at 2219–22.  Case

briefs were due June 20, 2008, and rebuttal briefs were due June 25, 2008.  See Final Results, 73

Fed. Reg. at 43,685.  Taifa did not file a case brief or rebuttal brief.  See id.  Commerce first

indicated that it would apply total AFA in the Issues and Decision Memorandum and AFA

Memorandum issued on July 14, 2008, and then applied total AFA and assigned Taifa the PRC-

wide rate of 383.60% in the Final Results issued later that month.[1]  See id. at 43,688; Issues and

Decision Memorandum at 6; AFA Memorandum at 11.  Because the Preliminary Results were

favorable to Taifa, and Commerce did not address the AFA issue until after the deadline for case

briefs or the PRC-wide rate issue until the Final Results, Taifa did not have a fair opportunity to

challenge these issues at the administrative level.  See Saha Thai Steel Pipe Co. v. United States,

828 F. Supp. 57, 59–60 (CIT 1993) (holding that a respondent was not required to file a case

brief or rebuttal brief to exhaust its administrative remedies where it had "received all the

remedy it sought from the preliminary determination, i.e., it received a very low company-

specific duty assessment," but Commerce assigned a higher country-wide rate in the final

determination).  Taifa is not required to predict that Commerce would accept other parties'

arguments and change its decision.  The exhaustion doctrine therefore does not preclude the

court's review of Taifa's claims.

## II.      Application of AFA

Taifa claims that Commerce's application of AFA based on Taifa's decision not

to report FOP or sales data for wheels and Taifa's conduct at verification was not supported by

---

[1] Although Commerce's verification report was issued before the deadline for case briefs, the report did not conclude that Commerce would apply AFA, deny Taifa's separate rate status, or assign Taifa the PRC-wide rate.

substantial evidence.  (Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on the Agency R. ("Pl.'s

Br.") 12–18.)  This claim lacks merit.

Commerce uses "facts otherwise available" in its determination if:

(1) necessary information is not available on the record, or
(2) an interested party . . .
    (A) withholds information that [Commerce has requested],
    (B) fails to provide such information by the deadlines for submission of
    the information or in the form and manner requested, . . .
    (C) significantly impedes a proceeding . . . , or
    (D) provides such information but the information cannot be verified.

19 U.S.C. § 1677e(a).  If Commerce "finds that an interested party has failed to cooperate by not

acting to the best of its ability to comply with a request for information," Commerce "may use an

inference that is adverse to the interests of that party in selecting from among the facts otherwise

available" in its determination, id. § 1677e(b), and disregard information that the party

submitted,[2] see id. § 1677m(d), (e)(4).  Commerce may draw an adverse inference if it makes

[(1)] an objective showing that a reasonable and responsible importer would have
known that the requested information was required to be kept and maintained
under the applicable statutes, rules, and regulations[ and (2)] a subjective showing
that the respondent under investigation not only has failed to promptly produce
the requested information, but further that the failure to fully respond is the result
of the respondent's lack of cooperation in either: (a) failing to keep and maintain
all required records, or (b) failing to put forth its maximum efforts to investigate
and obtain the requested information from its records.

Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382–83 (Fed. Cir. 2003).

---

[2] If Commerce "determines that a response to a request for information . . . does not
comply with the request, [Commerce] shall promptly inform the person submitting the response
of the nature of the deficiency and shall, to the extent practicable, provide that person with an
opportunity to remedy or explain the deficiency in light of the time limits" for the review before
disregarding the party's responses and relying on AFA. Id. § 1677m(d).  Taifa does not argue
that Commerce gave insufficient notice about the deficiencies in Taifa's responses or an
inadequate opportunity to remedy or explain the deficiencies.

**A.  Application of AFA based on Taifa's failure to report information about wheels**

Taifa argues that because the <u>AD Order</u> explicitly excludes "wheels and tires used in the manufacture of hand trucks," <u>AD Order</u>, 69 Fed. Reg. at 70,122, Commerce's decision to apply AFA because Taifa did not report information about hand truck wheels essentially punishes Taifa for failing to provide information about non-subject merchandise (Pl.'s Br. 12–13).  This argument fails because the <u>AD Order</u> encompasses "assembled or unassembled" hand trucks and defines a "complete . . . hand truck" as having wheels.  <u>AD Order</u>, 69 Fed. Reg. at 70,122.  Hand trucks that Taifa shipped with wheels to be attached later would constitute unassembled hand trucks, which are subject merchandise under the <u>AD Order</u>.  Wheels that need only be attached to an otherwise complete hand truck shipped with the wheels are not separate wheels used in the manufacturing process for hand trucks.  Accordingly, Taifa was required to report information about such wheels.

Although Taifa stated in its questionnaire responses that it did not sell wheels with hand trucks and did not report any FOP data for wheels, Commerce found evidence that Taifa sold and shipped unattached wheels with hand trucks.  <u>See</u> <u>AFA Memorandum</u> at 7–9.  At verification, Commerce "collected production notices that were identifiable as being for models that were subject to the [<u>AD Order</u>], and made reference to wheels."  (Def.'s App. 93.)  A Taifa manager admitted that "Taifa did not attach the wheels to the hand trucks sold to the United States in order to avoid having to pay U.S. dumping duties on the wheels under the [<u>AD Order</u>]." (<u>Id.</u>)  Another Taifa manager stated that when customers order hand trucks with wheels, they purchase "wheels from another supplier or from Taifa and that the wheels were not attached to the hand trucks but were loaded in the shipping container with the hand trucks."  (<u>Id.</u> at 94.)

Accordingly, Commerce properly relied upon "facts otherwise available" because FOP information for wheels necessary to calculate normal value, U.S. price, and an accurate dumping margin was not available on the record, and Taifa withheld requested information about shipments of wheels with hand trucks.[3] See 19 U.S.C. § 1677e(a)(1), (2)(A). Although by itself, this conduct might not be sufficient to draw an adverse inference in selecting a final rate, it is part of a course of conduct as discussed infra.[4]

**B. Application of AFA based on Taifa's conduct at verification**

Taifa also challenges Commerce's decision to apply AFA based on Taifa's conduct during verification. (Pl.'s Br. 13–15.) This challenge similarly fails.

According to the verification report, Commerce requested copies of the factory-out slips for the POR, but Taifa's production manager stated that Taifa immediately destroys the slips after creating monthly summary sheets, and that Taifa had destroyed the summary sheets

---

[3] Although Taifa provided information regarding U.S. wheels sales prior to verification in its December 2007 response to Commerce's fifth supplemental questionnaire, the information did not link shipments of wheels with shipments of hand trucks and did not provide FOP data necessary to calculate an accurate antidumping margin. (See Pl.'s App. Tab 3.)

[4] Taifa asserts that Commerce applied AFA on an "exceedingly narrow factual basis," as Taifa sold [[       ]] hand trucks without wheels to U.S. customers and sold [[       ]] wheels to its U.S. hand truck customers during the POR, and therefore only [[       ]] percent of Taifa's U.S. hand truck customers were wheel customers. (Confidential Reply Br. of Taifa 12.) Facts relating to a small percentage of actual sales, however, may be used as the basis for an adverse inference where the foreign producer admits it made such sales or it is otherwise established that such sales were made. See Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1339 (Fed. Cir. 2002) (affirming Commerce's 30.95% dumping margin where the respondent admitted making a sale with that margin but claimed the sale represented only 0.04% of its sales during the POR). Because Taifa admitted that at least a small percentage of its sales involved hand trucks shipped with wheels, and Taifa did not report the FOP data for those wheels, Commerce could rely on those facts as some evidence to support an adverse inference.

*Confidential Data Deleted*

and "any remaining documentation." (Def.'s App. 91–92.) Commerce, however, "found several stacks of old factory-out slips" and "pointed out to Taifa officials that the existence of these slips contradicted" the manager's statements. (Id. at 92.) Thirty minutes after Commerce's initial request, a Taifa senior accountant "finally said that they did maintain copies of the factory-out slips, and he departed to get them." (Id.) After Commerce officials asked to accompany the senior accountant, however, "he stopped and reverted to his prior position that they do not have any of the slips" for twenty minutes before agreeing to get the slips and to allow Commerce officials to accompany him. (Id.)

Commerce also requested copies of the factory production notices for the POR, but Taifa's production manager stated that Taifa immediately destroys production notices. (Id. at 91.) A Commerce official, however, "found numerous production notices with dates extending back to and beyond the POR" in a Taifa office. (Id. at 93.) Taifa officials did not answer the Commerce officials' questions about the production notices. (Id.)

Additionally, Taifa officials did not immediately provide Taifa's current, 2008 production subledger upon Commerce's request. (Id. at 92.) Nonetheless, a Commerce official saw the senior accountant attempt to put the 2008 production subledger in his pocket. (Id. at 92–93.) The Commerce official obtained the sublegder but discovered that pages had been ripped out. (Id. at 93.) The Commerce official later retrieved the missing pages from a woman who had attempted to leave the warehouse when the official arrived. (Id.)

A reasonable and responsible foreign producer would have known that it must keep and maintain documents such as factory-out slips, production notices, and production subledgers, and Taifa officials' efforts to avoid producing the requested documents demonstrates

that Taifa failed to put forth maximum efforts to investigate and obtain the documents. See

Nippon Steel, 337 F.3d at 1382–83. Although Commerce recovered the documents, Taifa's false

statements and attempts to avoid producing the information significantly impeded Commerce's

investigation. See Gerber Food (Yunnan) Co. v. United States, 491 F. Supp. 2d 1326, 1337 (CIT

2007) ("[A] party's unresponsiveness and failure to cooperate prior to providing the needed and

verifiable information might significantly and unnecessarily impede the proceeding and waste

the Department's resources."). Taifa thus failed to cooperate with Commerce's verification to

the best of its ability, and substantial evidence supported Commerce's decision to apply adverse

inferences.

Taifa's conduct at verification also supports Commerce's decision to apply AFA

to all the facts relevant to calculating Taifa's dumping margin, rather than merely to any facts

missing from the record.[5] Because Taifa attempted to withhold or alter sales and production

documents that Commerce requested, Commerce properly concluded that the information that

Taifa provided was "incomplete and unreliable" and that no information on the record could be

used to calculate an accurate dumping margin for Taifa. Issues and Decision Memorandum at 6.

Commerce therefore could disregard all of the information Taifa provided, apply AFA to all of

the facts relevant to calculating Taifa's dumping margin, and apply a substitute rate. See

---

[5] Commerce often uses the term "total AFA" to refer to application of AFA "to the facts
respecting all of respondents' sales encompassed by the relevant antidumping duty order," rather
than the specific facts "for which information was not provided." Shandong Huarong Mach. Co.
v. United States, 435 F. Supp. 2d 1261, 1265 n.2 (CIT 2006). Here, however, Commerce's
application of total AFA also encompassed Taifa's ownership status. Issues and Decision
Memorandum at 6. Because the court rejects Commerce's AFA analysis regarding Taifa's
ownership in the discussion of the PRC-wide rate infra, the court will not use the term "total
AFA" in this discussion.

Shanghai Taoen Int'l Trading Co. v. United States, 360 F. Supp. 2d 1339, 1348 n.13 (CIT 2005)

(affirming Commerce's decision to apply AFA to all of the facts relevant to calculating the

respondent's margin where "core" information that it provided was not reliable).

## III.    Application of the PRC-wide rate as the AFA rate

Taifa also claims that Commerce's selection of the PRC-wide rate as the AFA

rate was not supported by substantial evidence or in accordance with law.  (Pl.'s Br. 8–11,

18–20.)  This claim has merit.

In determining the AFA rate, Commerce may rely on information from "(1) the

petition, (2) a final determination in the investigation . . . , (3) any previous review . . . or

determination . . . , or (4) any other information placed on the record."  19 U.S.C. § 1677e(b).

When relying on secondary information not obtained during the review, Commerce "shall, to the

extent practicable, corroborate that information from independent sources that are reasonably at

[its] disposal."  Id. § 1677e(c).  The AFA rate should "be a reasonably accurate estimate of the

respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-

compliance," not a punitive or unreasonably high rate "with no relationship to the respondent's

actual dumping margin."  F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216

F.3d 1027, 1032 (Fed. Cir. 2000).  Because an AFA rate must bear some relationship to the

respondent's actual dumping margin, Commerce's ability to apply the PRC-wide rate as a

respondent's AFA rate is limited.  See Gerber Food (Yunnan) Co. v. United States, 387 F. Supp.

2d 1270, 1287–88 (CIT 2005).

At present, Commerce applies a presumption of state control for a respondent in a

nonmarket economy ("NME") country such as the PRC.  See Sigma Corp. v. United States, 117

F.3d 1401, 1404–05 (Fed. Cir. 1997); <u>Shandong Huanri (Group) Gen. Co. v. United States</u>, 493

F. Supp. 2d 1353, 1357 (CIT 2007).[6]  Under this presumption, a respondent receives the NME

country-wide rate unless it affirmatively demonstrates an absence of de jure and de facto

government control with respect to exports and is therefore entitled to a separate, company-

specific rate.  <u>See</u> <u>Sigma</u>, 117 F.3d at 1405.  Because the PRC-wide rate thus presumes

government control, Commerce may not apply the PRC-wide rate as the AFA rate where AFA is

warranted for sales and FOP data, but the respondent has established independence from

government control.  <u>Gerber</u>, 387 F. Supp. 2d at 1287 (citing <u>Shandong Huarong Gen. Group</u>

<u>Corp. v. United States</u>, 27 CIT 1568 (2003)).  In such a situation, there is no connection between

the PRC-wide rate and an estimate of the respondent's actual rate.  <u>See</u> <u>id.</u>

 Accordingly, Commerce could not apply the PRC-wide rate to Taifa based on

Taifa's failures to report FOP data for wheels or attempts to avoid producing requested

documents regarding sales and production at verification alone.  Commerce could apply the

PRC-wide rate only if Taifa did not establish its de jure and de facto independence from

government control.

 Here, Commerce's <u>Preliminary Results</u> found an absence of de jure and de facto

government control,[7] <u>Preliminary Results</u>, 73 Fed. Reg. at 2219, and Commerce's verification

---

[6] The court need not address the strength or effect of this presumption at this stage.  As China is evolving, however, it may be appropriate for Commerce to reevaluate its methodology in this regard at some point.  Presumptions cannot become an excuse for inadequate investigation or assessment.

[7] Evidence of absence of de jure government control "includes: (1) [a]n absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; or (3) any other formal

              (continued...)

report "noted no indication of government control" (Def.'s App. 88).  Nevertheless, Commerce's

Final Results applied the PRC-wide rate because Commerce could not verify documents

regarding Taifa's ownership structure.  See Final Results, 73 Fed. Reg. at 43,686; Issues and

Decision Memorandum at 4.  Specifically, Commerce found that some documents listed the

Yinzhu Town Government as the holder of 51.42% of Taifa's shares, but all other documents

identified a collective called Qingdao Taifa Group Co. as the owner of those shares.[8]  (See Def.'s

App. 83–87.)  The documents that Taifa offered to show that the shares were divested in 2003

were unregistered.[9]  (Id. at 85–86.)  Determining that Taifa failed to keep and maintain full and

---

[7](...continued)
measures by the government decentralizing control of companies."  Final Determination of Sales at Less Than Fair Value: Sparklers From the People's Republic of China, 56 Fed. Reg. 20,588, 20,589 (Dep't Commerce May 6, 1991) ("Sparklers"); see also Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States, 44 F. Supp. 2d 229, 242 (CIT 1999) ("Brake Drum I").  Evidence of absence of de facto government control includes whether: (1) "each exporter sets its own export prices independently of the government and other exporters;" (2) "each exporter can keep the proceeds from its sales;" (3) "the Respondent has authority to negotiate and sign contracts and other agreements;" and (4) "the Respondent has autonomy from the government in making decisions regarding the selection of management."  Brake Drum I, 44 F. Supp. 2d at 243 (citing Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China, 59 Fed. Reg. 22,585, 22,587 (Dep't Commerce May 2, 1994) ("Silicon Carbide")).  Commerce preliminarily found that Taifa had presented statements and documentation satisfying each form of evidence of absence of de jure and de facto government control.  Preliminary Results, 73 Fed. Reg. at 2219.

[8] According to Taifa, the collective, not the government, owned the interest in Taifa, and the references to the Yinzhu Town Government were due to drafting errors in some of the documents and in others, because the government acted on behalf of the collective.  (Def.'s App. 83–84.)

[9] A 2003 Shares Transfer Agreement states that the 51.42% interest was transferred from "Yingzhu People's Government" to nine named individuals.  (Id. at 70.)  Taifa contends that this agreement is unregistered because of the Qingdao Administration for Industry and Commerce's ("AIC") bureaucratic delay in processing it.  (Pl.'s Br. 19.)  The other record supporting the transfer is Taifa's 2003 Articles of Association.  (See Def.'s App. 85.)  Although Taifa

(continued...)

complete records documenting its ownership information, which a reasonable importer should anticipate having to produce, Commerce applied AFA to the facts of Taifa's control, denied Taifa a separate rate, and applied the PRC-wide rate.  Final Results, 73 Fed. Reg. at 43,686–88; Issues and Decision Memorandum at 6.

Mere evidence that a town government may own shares in Taifa, however, is insufficient to support Commerce's application of the PRC-wide rate.  Although local government ownership is of some limited relevance to the analysis, government ownership is not tantamount to government control.

The Federal Circuit has recognized that Commerce may apply an NME country-wide rate, as opposed to a separate, company-specific rate, where a respondent is subject to central government control.  See Transcom, Inc. v. United States, 182 F.3d 876, 883 (Fed. Cir. 1999); Sigma, 117 F.3d at 1405.  Nevertheless, the Federal Circuit has not addressed whether an NME country-wide rate is appropriate where the respondent is subject to local or town government control.

Two cases before this Court, however, have recognized that town government control may be relevant.  See Shandong Huanri, 493 F. Supp. 2d at 1360–64; Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States, 318 F. Supp. 2d 1305, 1312–14 (CIT 2004) ("Brake Drum II").  The first, Brake Drum II, stated that Commerce's "separate-rate test should not be limited to proving absence of national-government ownership but should be

---

⁹(...continued)
acknowledged that the 2003 Articles of Association "should be registered with the AIC" under the Regulations of the People's Republic of China on Administration of Registration of Companies, Taifa asserts it neglected to register the document because the person responsible resigned.  (Id. at 63, 85.)

applied to whatever level of governmental control is implicated." 318 F. Supp. 2d at 1312. In

that case, Commerce had granted a separate rate to Shandong Laizhou Huanri Group General

Co. ("Huanri"), which was controlled by a village committee related to the town government.

Id. at 1306, 1313. Brake Drum II remanded for reconsideration based on the PRC's Organic

Law of the Village Committee ("Village Committee Law") that was not in the record, "which

may or may not be a promulgation of the central government and which may or may not provide

that government or a subordinate, even grass-roots village, government with ultimate, nonmarket

control." Id. at 1314. The second case, Shandong Huanri, summarily found that substantial

evidence of de facto government control supported Commerce's decision to apply the PRC-wide

rate to Huanri in a subsequent administrative review. 493 F. Supp. 2d at 1360–62, 1364.

These cases, however, must not be construed too broadly. They merely recognize

that Commerce may apply the PRC-wide rate where it finds that a town or other local

government exercises nonmarket control over a respondent's business activities, and where a

promulgation of the PRC's central government such as the Village Committee Law authorizes

the local government to exercise that type of control over the respondent. See id. at 1360–64;

Brake Drum II, 318 F. Supp. 2d at 1312, 1314. They do not hold that local government

ownership by itself is sufficient to support the application of a PRC-wide rate.

Indeed, as Commerce stated in the Preliminary Results, "government ownership

by itself is not dispositive in determining government control." Preliminary Results, 73 Fed.

Reg. at 2219; see also Tapered Roller Bearings and Parts Thereof, Finished and Unfinished,

From the People's Republic of China; Final Results and Partial Termination of Antidumping

Duty Administrative Review, 62 Fed. Reg. 6173, 6175 (Dep't Commerce Feb. 11, 1997)

("Tapered Roller Bearings") (noting that Commerce has "rejected [its prior] position that state ownership per se eliminates the possibility of a company gaining a separate rate"). Commerce previously has applied separate rates, rather than PRC-wide rates, in instances where a government entity has an ownership interest in the respondent but does not exercise de facto control over the respondent's prices or export activities. See, e.g., Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Structural Steel Beams From The People's Republic of China, 66 Fed. Reg. 67,197, 67,199 (Dep't Commerce Dec. 28, 2001) (applying a separate rate to a company that was sixty-three percent owned by a holding company wholly owned by a provincial government because there was no evidence of de facto control); Silicon Carbide, 59 Fed. Reg. at 22,588 (applying separate rates to companies allegedly owned by provincial governments because there was no evidence of government manipulation of export prices or interference with their export business); see also Issues and Decision Memorandum for the Antidumping Investigation of Certain New Pneumatic Off-the-Road Tires from the People's Republic of China, A-570-912, POR 10/1/2006-3/31/2007, at 187–88 (July 7, 2008), available at http://ia.ita.doc.gov/frn/summary/PRC/E8-16156-1.pdf (stating that "the mere existence of government-owned shares in the producer is not a basis for denying separate rate status," and that Commerce "looks beyond ownership in considering whether there is de facto government control"). Commerce also has applied separate rates in instances where a government entity owns shares of the respondent's stock but does not vote the shares or otherwise exercise operational control over the respondent's business. See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Disposable Pocket Lighters From the People's Republic of China, 60 Fed. Reg. 22,359, 22,360–61 (Dep't Commerce May 5, 1995)

("Disposable Pocket Lighters"); Notice of Final Determination of Sales at Less Than Fair Value:

Certain Cased Pencils From the People's Republic of China, 59 Fed. Reg. 55,625, 55,626–29

(Dep't Commerce Nov. 8, 1994).

Reliance on evidence of de facto government control beyond a mere local

government ownership interest is consistent with the purposes of the antidumping statute, which

"recognizes a close correlation between a nonmarket economy and government control of prices,

output decisions, and the allocation of resources." Sigma, 117 F.3d at 1405–06. The statute

applies special rules to NME countries because prices and costs are not reliable in valuing goods

from NME countries "in view of the level of intervention by the government in setting relative

prices." ICC Indus., Inc. v. United States, 812 F.2d 694, 697 (Fed. Cir. 1987); see 19 U.S.C.

§ 1677(18)(A) (defining an NME country as a country which "does not operate on market

principles of cost or pricing structures, so that sales of merchandise in such country do not reflect

the fair value of the merchandise"); see also id. § 1677b(c). Thus, a government's de facto

interference with a respondent's export activities or prices or operational control over the

respondent may render the respondent's prices and costs unreliable. See Tapered Roller

Bearings, 62 Fed. Reg. at 6175; Disposable Pocket Lighters, 60 Fed. Reg. at 22,363. But a town

or local government's ownership interest in a respondent, without more, does not render the

respondent's prices and costs inherently unreliable or sufficiently linked to a China-wide rate.

As this Court has recognized, "[t]he essence of a separate rates analysis is to determine whether

the exporter is an autonomous market participant, or whether instead it is so closely tied to the

communist government as to be shielded from the vagaries of the free market." Fujian Mach. &

Equip. Imp. & Exp. Corp. v. United States, 178 F. Supp. 2d 1305, 1331 (CIT 2001). The court

concludes, therefore, that Commerce may not apply an NME country-wide rate where there is

evidence that a town government had an ownership interest in the respondent, but there is no

evidence that the government exercised de facto control over the respondent's prices, export

activities, or operations.

        Here, Commerce's decision to apply AFA to the facts of Taifa's control because

Taifa's ownership documents could not be verified was apparently based on the flawed

assumption that town government ownership alone establishes government control sufficient to

trigger application of a China entity rate.  Here Commerce applied the China entity rate without

making a final determination about the presence or absence of de facto Chinese government

control over Taifa's operations.  Although Commerce has not cited any indications that the

Yinzhu Town Government, or any other government entity, controlled Taifa's prices or export

activities or exercised any operational control over Taifa, or any indications of a connection

between the central government and Taifa's control, the court remands the matter to Commerce

for a proper analysis of de facto control.

## CONCLUSION

        For the foregoing reasons, Taifa's motion for judgment on the agency record is

granted in part and denied in part.  The court hereby remands this matter to Commerce to

determine whether a government entity exercised de facto nonmarket control over Taifa

sufficient to link the China entity rate to Taifa.  If Commerce concludes based on substantive

evidence that such government entity control over Taifa exists, Commerce may apply the PRC-

wide rate of 383.60% to Taifa.[10]  If Commerce concludes otherwise, Commerce must calculate a

separate, substitute AFA rate for Taifa.

Commerce shall file its remand determination with the court within sixty days of

this date.  Taifa, Gleason, and Precision have eleven days thereafter to file objections, and

Commerce will have seven days thereafter to file its response.


                                                 _____/s/ Jane A. Restani_____
                                                     Jane A. Restani
                                                     Chief Judge


Dated: This 11th day of August, 2009.
         New York, New York.


_____

[10] Taifa did not challenge Commerce's calculation of the 383.60% PRC-wide rate before
the court.  Accordingly, although that rate was a minimally corroborated petition rate based on
AFA, see Notice of Final Determination of Sales at Less Than Fair Value: Hand Trucks and
Certain Parts Thereof from the People's Republic of China, 69 Fed. Reg. 60,980, 60,982, 60,984
(Dep't Commerce Oct. 14, 2004), amended by 69 Fed. Reg. 65,410 (Dep't Commerce Nov. 12,
2004), Taifa has waived any challenge to the calculation of the rate, see AL Tech Specialty Steel
Corp. v. United States, 366 F. Supp. 2d 1236, 1245 (CIT 2005) ("Arguments that are not
properly preserved are waived.").

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____    By: _____

Deputy Clerk