Slip Op. 10-126

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| QINGDAO TAIFA GROUP CO., LTD.,      : | |
| : | |
| Plaintiff,      : | |
| : | |
| v.      : | Before: Jane A. Restani, Judge |
| : | |
| UNITED STATES,      : | Court No. 08-00245 |
| : | |
| Defendant,      : | |
| : | |
| and      : | |
| : | |
| GLEASON INDUSTRIAL PRODUCTS, INC.      : | |
| and PRECISION PRODUCTS, INC.,      : | |
| : | |
| Defendant-Intervenors.      : | |

## OPINION

[Department of Commerce's second remand results in antidumping duty matter remanded for reconsideration or explanation of application of China country-wide rate.]

Dated: November 12, 2010

Adduci, Mastriani & Schaumberg, LLP (Louis S. Mastriani and William C. Sjoberg) for the plaintiff.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Stephen C. Tosini); Thomas M. Beline, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for the defendant.

Crowell & Moring LLP (Matthew P. Jaffe and Alexander H. Schaefer) for the defendant-intervenors.

Restani, Judge: This matter comes before the court following its decision in

Qingdao Taifa Grp. Co. v. United States, 710 F. Supp. 2d 1352 (CIT 2010) ("Taifa II"), in which

the court remanded the Final Results of Redetermination Pursuant to Court Remand (Dep't

Commerce Jan. 22, 2010) (Docket No. 100) ("First Remand Results") on Hand Trucks and

Certain Parts Thereof from the People's Republic of China; Final Results of 2005-2006

Administrative Review, 73 Fed. Reg. 43,684 (Dep't Commerce July 28, 2008) to the United

States Department of Commerce ("Commerce").

## BACKGROUND

The facts and procedural history of this case are fully explained in the court's two

prior opinions in this matter.  See Taifa II, 710 F. Supp. 2d at 1353–55; Qingdao Taifa Grp. Co.

v. United States, 637 F. Supp. 2d 1231, 1234–36 (CIT 2009) ("Taifa I").

In Taifa II, the court instructed Commerce "to determine, after proper

investigation and analysis, whether a government entity exercised nonmarket control over"

plaintiff Qingdao Taifa Group Co., Ltd. ("Taifa") sufficient to link the People's Republic of

China ("PRC") entity-wide rate to Taifa.  Taifa II, 710 F. Supp. 2d at 1357.  The court gave

Commerce three options:

> First, if Commerce determines that Taifa is not independent of the PRC
> government's control based on . . . documents indicating town government
> ownership, Commerce must explain, based on PRC law, prevailing practices in
> the PRC, or other relevant information, why these particular documents are
> significant to the issue of government control, how the documents ultimately link
> Taifa to central PRC government control and a rate relating thereto, and why the
> fact that . . . documents indicating the transfer of the town government's interest
> were not properly registered in the PRC is significant to the issue of government
> control.  Alternatively, if Commerce finds that the evidence does not indicate that
> a government entity controlled Taifa's prices, export activities, or operations and
> no ultimate link between Taifa and the rates applicable to central PRC
> government-controlled entities, then Commerce should conclude that Taifa has
> established its independence from government control sufficient to reject a
> country-wide rate.  Finally, if, after thorough investigation and analysis,

> Commerce finds the evidence regarding government control of pricing, export
> activities, or operations and regarding Taifa's relationship to the central PRC
> government in equipoise, Commerce may apply a well-supported and explained
> presumption based on current conditions that Taifa is government-controlled and
> apply the appropriate rate.

Id. at 1358 (footnote call numbers omitted).

Commerce asserts it chose the third option on remand.  Final Results of

Redetermination Pursuant to Court Remand 4, 23 (Dep't Commerce July 27, 2010) (Docket No.

118) ("Second Remand Results").  Commerce found that "Taifa failed verification with respect

to its separate rate status," id. at 19, because Commerce found documents indicating that the

Yinzhu Town Government owned a majority interest in Taifa, contrary to representations in

Taifa's separate rate questionnaire responses, and because Taifa failed to register with the proper

authorities documents indicating the transfer of the majority interest to certain individuals, six of

whom were also members of Taifa's board of directors, which controls and manages the

company, id. at 5–19.  Commerce concluded that it could not determine whether those directors

"actually operate under their own legitimate independent direction as Taifa claims, or whether

the absence of proper documentation reflects an undisclosed continuation of governmental

control over Taifa."  Id. at 13.  Commerce found that Taifa had not established a legitimate

separation from the town government and applied a "presumption" that a respondent in a

nonmarket economy ("NME") country such as the PRC is state-controlled.  Id. at 13–19.

Following the remand determination, the court met with the parties in an attempt

to learn how Commerce addresses these issues and the basis for its presumption of state control

in this industry or for this company, which contrary to the court's order did not appear to be

explained adequately.  The parties were forthcoming about their views of these matters, but their

approaches understandably differ.  The court must address these underlying methodological

issues in order for it to resolve the basic dispute of whether plaintiff should receive its own rate

or the 383.60% PRC-entity rate.[1]

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will not

uphold Commerce's final determination in an antidumping review if it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

## DISCUSSION

The essence of Commerce's reasoning is that Taifa's assertion that it is controlled

by an independent board of directors is not credible because Taifa impeded Commerce's review

by withholding information relating to its town government ownership and provided information

that could not be verified in records outside the company.  See Second Remand Results at 15–19.

Although in assigning an antidumping duty rate Commerce may draw an adverse inference

against a respondent that withholds information, significantly impedes a proceeding, or provides

---

[1] Commerce believes that the 383.60% rate could be applied as an Adverse Facts
Available ("AFA") rate even if Taifa is a separate entity, but there would still have to be
substantial evidence supporting application of such a rate to Taifa, whether one calls it
corroboration of secondary data or something else.  Compare Gallant Ocean (Thai.) Co., Ltd. v.
United States, 602 F.3d 1319 (Fed. Cir. 2010) ("Gallant"), with KYD, Inc. v. United States, 607
F.3d 760 (Fed. Cir. 2010) ("KYD").  How such a rate is sufficiently linked to Taifa, which had a
rate of less than 30% in the original investigation, and where the actually calculated rates of
competitors has been less than that, in fact, down to zero, has never been adequately explained in
these proceedings.

information that cannot be verified if Commerce finds that the respondent "failed to cooperate by

not acting to the best of its ability to comply with a request for information," 19 U.S.C.

§ 1677e(b); see id. § 1677e(a)(2), such an adverse rate should "be a reasonably accurate estimate

of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-

compliance," not a punitive or unreasonably high rate "with no relationship to the respondent's

actual dumping margin," F.Lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216

F.3d 1027, 1032 (Fed. Cir. 2000) ("De Cecco").  Accordingly, Commerce may not apply the

PRC-wide rate if substantial evidence does not support the finding that a government entity

exercised nonmarket control over the respondent, and if there is no ultimate link between the

respondent and the central PRC government.[2]  See Taifa II, 710 F. Supp. 2d at 1356–57; Taifa I,

637 F. Supp. 2d at 1240–44; see also Gerber Food (Yunnan) Co. v. United States, 387 F. Supp.

2d 1270, 1287–88 (CIT 2005); Shandong Huarong Gen. Grp. Corp. v. United States, 27 CIT

1568, 1594–95 (2003).

In order to understand how this case arrived in its current posture and how it may

be resolved, it is necessary to explain the development of the case, one hopes, in plain terms.

First, what are no longer open issues before the court are 1) that plaintiffs may challenge, without

the bar of failure to exhaust claims, its designation as part of China's state-owned enterprise

structure, 2) that plaintiff may not challenge the calculation of the dumping rate applied to that

---

[2] As the court stated in Taifa I, "Commerce could not apply the PRC-wide rate to Taifa based on Taifa's failures to report [production] data for wheels or attempts to avoid producing requested documents regarding sales and production at verification alone." 637 F. Supp. 2d at 1241.  These are separate matters, although this may influence the weight Commerce gives to Taifa's internal documents.

structure, the PRC-wide entity rate, having waived that issue, and 3) that if plaintiff is to receive

a rate separate from the PRC-wide entity rate, it will still be a rate based on facts available and an

adverse inference ("AFA rate"), because of acts committed during Commerce's verification visit

to its factory.

What remains at issue are the following: 1) Is plaintiff entitled to a separate

AFA rate. 2) If so, is the separate AFA rate calculated by Commerce in its first remand

determination supported by substantial evidence. The alternative PRC-wide entity rate plaintiff

seeks to avoid is 383.60%. There is little likelihood that in any real world this could be an

approximation of an actual rate. It is nearly four times the price of the subject merchandise, i.e.,

hand trucks and certain parts thereof.

As the court understands it, such rates derive from Commerce's decision that the

PRC government, as the presumed owner of enterprises in a particular industry, which as a

sovereign does not respond to questionnaires and does not cooperate in the investigation,

receives a very high AFA rate based on information normally provided by the domestic industry

in its petition. Furthermore, any entity which does not establish its status as separate from the

PRC government receives this rate.[3]

In the preliminary determination, Commerce found that Taifa was sufficiently

separate from PRC government-ownership and control, that it would receive its own rate. See

Taifa I, 637 F. Supp. 2d at 1235. Events intervened, notably the failed verification of Taifa's

_____

[3] Why one presumes that the PRC government owns some companies in this particular
industry has not been explored in the case, and the court accepts that for this case that limited
presumption is true. See, infra p. 9 discussion.

sales and production data, and, as described earlier, information also gathered at verification that

cast doubt on Taifa's claim that a majority of its shares were registered in the name of

independent private individuals or entities.  See id.

All sides to this dispute emphasize that actual control of business decision-making

is the key.  Nonetheless, the briefing focused on the share registration issue and the somewhat

conflicting views of Commerce, also reflected in the less than clear case law, as to the

importance of de jure ownership.[4]  As, normally, who owns a company might tell one something

about who controls its business decisions, one cannot fault the parties for at least considering the

issue of de jure ownership.  There is record evidence, however, that this company makes its own

decisions, and there is no evidence of outside control of the relevant decisions.  To be sure, Taifa

has been shown to be less than honest, and Commerce is entitled to treat internal documents

about who is running Taifa with skepticism.  Skepticism, however, does not mean total disregard.

In any case, the court, in its review of Commerce's initial final determination,

failed to see the connection between a PRC-wide entity rate and the way Taifa did business, so it

directed Commerce to describe the evidence which would get the court from A to B to C on the

issue or else give Taifa its own rate, adverse though it would be.  Commerce, in its first remand

results returned a determination to the court objecting to rejection of its "presumption" of state-

_____

[4] Although some cases state that the showing of both de jure and de facto independence is required, Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997), the standard is actually more flexible than this stark formulation may indicate, see Taifa I, 637 F. Supp. 2d at 1243 (stating that "Commerce previously has applied separate rates, rather than PRC-wide rates, in instances where a government entity has an ownership interest in the respondent but does not exercise de facto control over the respondent's prices or export activities" (citing various agency determinations)).

ownership and the 383.60% rate.  In that determination, Commerce stated that it has no choice

under the court's decision but to assign Taifa a separate (and different) rate.  It decided upon a

rate of 227.73%.  This rate is from data in the latest review in which Taifa was a mandatory

respondent (and where its data was not rejected).  It is from a less than fair value margin

calculation for a group of sales representing 12% of Taifa's U.S. sales.  First Remand Results at

3, 21.  The court did not reach the issue of the validity of this rate but remanded the matter again

because it viewed its decision, not as directing a result, but as requiring Commerce to explain a

methodology that would link Taifa to the PRC-wide rate or make clear why it was not linked.

See Taifa II, 710 F. Supp. 2d at 1357–58.

In its second remand results, Commerce abandoned the 227.73% rate and returned to the

383.60% PRC-wide rate.  It explained the methodology essentially as follows:

1) There is a "presumption" that Taifa is state-owned.

2) Taifa may rebut the presumption.

3) Taifa lied.  Thus, it is not in a position to rebut the presumption.

4) If Commerce, pursuant to the court's orders, must consider Taifa's information, despite
3 above, Commerce finds there is evidence of equal weight (basically as to ownership)
that contradicts evidence favorable to Taifa so that the presumption is not rebutted.

See Second Remand Results at 19.  The second remand results, however, did more.  Commerce

finally came to grips with the fact that its "presumption" of state-control was a factual one,

subject to change over time and based on Chinese laws and policies in effect in 1993, but

apparently no longer in effect.  See Second Remand Results at 28–31.  Thus, Commerce looked

at an updated assessment of state-control of Chinese businesses.  Id.  It did not supply the

document or even a web citation to it, but the parties seem to know what it is.  See id.;

Antidumping Duty Investigation of Certain Lined Paper Products from the People's Republic of

China ("China") - China's status as a non-market economy ("NME"), A-570-901 (Aug. 30,

2006) ("Certain Lined Paper"), available at http://ia.ita.doc.gov/download/prc-nme-status/prc-

lined-paper-memo-08302006.pdf (last visited Oct. 29, 2010).  Therefore the court will address it,

even though technically it is not in the record.  Whatever data underlie this document, however,

are clearly not in the record and Commerce did not cite to any particular part of the document as

explaining why companies such as Taifa must be presumed to be state-owned or controlled by

the state in such a way that a separate rate is not warranted.  See Second Remand Results at

28–31.

          The court, however, has examined the document, particularly the portion relating

to the manufacturing sector, beginning at page 36.  It describes a movement over time from state-

control to private ownership and control, particularly as to smaller businesses, or non-core

industries.  Certain Lined Paper at 36–40.  It is unclear to the court what kind of private

ownership exists in China, but it does appear from Commerce's document that private ownership

exists in this section of the economy, so that businesses keep their profits and even foreign

investment is permitted.  Commerce seems to recognize this by allowing companies to

demonstrate separate status.  There is no indication that Taifa has foreign investors, but the court

could not find the support Commerce alleges is in this document for a presumption that Taifa is

state-owned or controlled to a degree that warrants application of the country-wide rate.  That

Commerce may make a judicially unreviewable decision that China is overall still a non-market

economy,[5] does not seem to answer the question of whether Commerce has supported a

presumption that a manufacturing company such as Taifa is likely to be state-owned.  Thus, to

date there is no link to a rate other than Taifa's own rate.

      If this were a case between the government and Taifa alone, the court would say

"enough."  After two remands and a failure to provide the information sought by the court to

support Commerce's determination, the court might leave the government to litigate this when,

presumably in another case, it is ready to support its view.  In which case, the court would order

that Taifa receive a separate rate, especially in view of Commerce's choice not to take the

opportunity to reopen the record.  There is no requirement in the statute that a PRC-wide rate be

imposed when other adverse rates are available or may be constructed.  This case, however,

involves other parties, the domestic competitors.  They remain entitled to a well-explained

decision, as much as Taifa does.

      So, we continue.  While not a model of clarity, the second remand determination

finding that the evidence of town ownership is at least in equipoise is supported.  See Second

Remand Results at 8–15.  Share documents, which would indicate that a majority of stock is

privately held, are not properly registered.  Id.  Certain stamps on "chops" are missing from other

documents which might establish separation from town ownership.  Id. at 9.  Documents in

Chinese government records did not match Taifa claims.  Id. at 10.  Thus, a finding of de jure

town-ownership may stand.

      Despite this, Commerce could find that an independent board of directors made

_____

[5] See 19 U.S.C. § 1677 (18)(D).

Taifa's business decisions without contamination by government resource allocation or other

non-market controls.  However, some explanation of how and by whom the decision-making of

town-owned manufacturing businesses generally is controlled in China is missing from the

second remand results.

       Thus, this matter must be remanded to Commerce.  If Commerce cannot explain

why substantial record evidence supports a finding of central government control that justifies

imposition of the PRC-wide entity rate, Taifa must get the rate its own lack of verifiable

production evidence warrants, without resort to an unconnected country-wide rate.  Commerce is

permitted to reopen the record on the issue of the link to the country-wide rate.  The mere

conclusions in the August 30, 2006, Memorandum, however, do not support a link to a PRC-

wide rate, as explained.

       Finally to avoid yet another remand, the court will review the selection of

227.73%, the separate rate from the first remand results, and the only separate rate Commerce

has selected, to the extent it is able to do so on this record.  Based on the results of the

investigation and reviews cited by the parties, the court doubts that this AFA rate reflects reality.

The issue is, is the AFA rate so far from what has been demonstrated by actual rates, that it must

be rejected as in <u>Gallant</u>, or is it an adequately supported rate as in <u>KYD</u>.  First of all, this is not

an actual rate.  It is not derived from an overall rate calculated for anyone by anyone.  Unlike a

petition rate, which although it is not from respondent's own data, is an overall rate, this rate is

for a portion of Taifa's sales.  Commerce sometimes uses a portion of sales to corroborate an

overall rate based on facts available.[6] [7] It does not appear to have done that here.

The court does find support for Commerce's rejection of Taifa's 26.49% rate from the original investigation.  See First Remand Results at 2–3.  After receiving such a rate, Taifa failed to cooperate fully in a subsequent review.  Commerce does not err by rejecting this rate.  Thus, Commerce should calculate a supported rate, particularly one somehow grounded in the realities of this industry.  Commerce is not necessarily confined to the rates of the investigation (up to 47%), but the rate must somehow be grounded in reality to avoid imposition of a punitive rate.  See De Cecco, 216 F.3d at 1032.

The court does not presume to know how Chinese businesses in general, or Taifa in particular, operate.  And the court appreciates that Commerce is sometimes stymied in trying to find answers to these questions. The court, however, can only review the record before it.  The court does appreciate the assistance of the parties in explaining the applicable methodologies, but

---

[6] Under 19 U.S.C. § 1677e(c), Commerce must "to the extent practicable" corroborate secondary information, i.e., information not "obtained in the course of an investigation or review."  19 U.S.C. § 1677e(c).

[7] The court has a problem with Commerce's apparent view of corroboration.  This requirement was added to the antidumping law pursuant to international commitments to keep AFA rates grounded in reality and also to respond to criticisms of prior "Best Information Available" methodology.  H.R. Rep. No. 103-826, at 105 (1994); Uruguay Round Table Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316 at 869 (1994).  Narrowing the concept of secondary information, as the court in KYD, as least in dicta, seemed to do, and simultaneously broadening the concept of corroboration (down to .50% of sales, see PAM S.p.A. v. United States, 582 F.3d 1336, 1340 (Fed. Cir. 2009)), would not seem to aid the control of punitive margins the statute intended.  One must remember that under the particular facts of Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330 (Fed. Cir. 2002) and PAM, the rates that were corroborated by a very small portion of actual sales were 30.95% and 45.49% respectively.  Ta Chen, 298 F.3d at 1339; PAM, 582 F.3d at 1340.  When rates are in multiples of 100%, one might assume that a bit more corroboration or record support is warranted.

in the final analysis, there must be substantial evidence supporting a decision.  A presumption

based on nothing is not evidence; thin air is not evidence supporting a dumping margin,

particularly one of almost 400%.

        REMANDED.


                                           /s/ Jane A. Restani
                                            Jane A. Restani
                                                 Judge

Dated: This 12th day of November, 2010.
       New York, New York.