Slip Op. 11-83

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                            :
QINGDAO TAIFA GROUP CO., LTD.,              :
                                            :
       Plaintiff,                       :
                                            :
       v.                               :    Before: Jane A. Restani, Judge
                                            :
UNITED STATES,                              :    Court No. 08-00245
                                            :
       Defendant,                       :    **Public Version**
                                            :
       and                              :
                                            :
GLEASON INDUSTRIAL PRODUCTS, INC.           :
and PRECISION PRODUCTS, INC.,               :
                                            :
       Intervenor Defendants.           :
_____:

## OPINION

[Judgment sustaining third remand results setting a separate entity AFA antidumping duty rate will be entered.]

Dated: July 12, 2011

       Adduci, Mastriani & Schaumberg, LLP (Louis S. Mastriani and William C. Sjoberg) for the plaintiff.

       Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Stephen C. Tosini); Thomas M. Beline, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for the defendant.

       Crowell & Moring LLP (Matthew P. Jaffe and Alexander H. Schaefer) for the intervenor defendants.

       Restani, Judge: This matter comes before the court following its decision in

Qingdao Taifa Grp. Co. v. United States, 760 F. Supp. 2d 1379, 1380 (CIT 2010) ("Taifa III"), in

which the court remanded the Final Results of Redetermination Pursuant to Court Remand (Dep't Commerce July 27, 2010) (Docket No. 118) ("Second Remand Results") on Hand Trucks and Certain Parts Thereof from the People's Republic of China; Final Results of 2005-2006 Administrative Review, 73 Fed. Reg. 43,684 (Dep't Commerce July 28, 2008) ("Final Results") to the United States Department of Commerce ("Commerce"). For the reasons stated below, the court sustains Commerce's third remand results.

## BACKGROUND

The facts of this case have been well documented in the court's previous three opinions. See Taifa III, 760 F. Supp. 2d at 1381–82; Qingdao Taifa Grp. Co. v. United States, 710 F. Supp. 2d 1352, 1353–55 (CIT 2010) ("Taifa II"); Qingdao Taifa Grp. Co. v. United States, 637 F. Supp. 2d 1231, 1234–36 (CIT 2009) ("Taifa I"). The court presumes familiarity with those decisions, but briefly summarizes the facts relevant to this opinion.

Plaintiff Qingdao Taifa Group Co., Ltd. ("Taifa") challenged the final results of an administrative review of the antidumping ("AD") duty order on hand trucks and certain parts thereof from the People's Republic of China ("PRC"), which assigned Taifa the PRC-wide dumping margin[1] of 383.60% based on total adverse facts available ("AFA"). See Final Results, 73 Fed. Reg. at 43,687. The court, granting Taifa's motion for judgment on the agency record in

---

[1] A dumping margin is the difference between the normal value ("NV") of merchandise and the price for sale in the United States. See 19 U.S.C. § 1673e(a)(1); 19 U.S.C. § 1677(35). Unless nonmarket economy ("NME") methodology is used, an NV is either the price of the merchandise when sold for consumption in the exporting country or the price of the merchandise when sold for consumption in a similar country. 19 U.S.C. § 1677b(a)(1). In an NME case, NV is calculated using information from comparable surrogate market economies. 19 U.S.C. § 1677b(c)(1). An export price or constructed export price is the price that the merchandise is sold for in the United States. 19 U.S.C. § 1677a(a)-(b).

part and denying it in part, remanded the matter to Commerce to determine whether a government entity exercised nonmarket control over Taifa sufficient to link the PRC-wide rate to Taifa and to calculate a separate, substitute AFA rate if the PRC-wide was not warranted. Taifa I, 637 F. Supp. 2d at 1244.

In its first remand results, Final Results of Redetermination Pursuant to Court Remand (Dep't Commerce Jan. 22, 2010) (Docket No. 100), Commerce assigned Taifa a separate AFA rate of 227.73% stating that it could not affirmatively demonstrate that a government entity exercised control over the company. Id. at 3. The court, however, held that Commerce "did not comply with [its] remand instructions to make a determination based on a proper analysis of nonmarket control" because it "still ha[d] not made a final finding about the presence or absence of de jure and de facto government control over Taifa, including a finding and explanation which substantiates or rejects a sufficient link to a country-wide PRC rate." Taifa II, 710 F. Supp. 2d at 1357. The court, therefore, remanded to Commerce, instructing it "to determine, after proper investigation and analysis, whether a government entity exercised nonmarket control over Taifa sufficient to link the PRC-wide rate to Taifa." Id.

In its Second Remand Results, "Commerce found that Taifa had not established a legitimate separation from the town government and applied a 'presumption' that a respondent in a nonmarket economy ('NME') country such as the PRC is state-controlled." Taifa III, 760 F. Supp. 2d at 1381–82; Second Remand Results, at 13–19. Nevertheless, the court held that the factual "presumption" made in this case was not supported by record substantial evidence. Taifa III, 760 F. Supp. 2d at 1384–85. As a result, the court remanded to Commerce for a third

time with instructions to either "explain why substantial record evidence supports a finding of central government control that justified imposition of the PRC-wide entity rate" or to give Taifa "the rate its own lack of verifiable production evidence warrants, without resort to an unconnected country-wide rate." Id. at 1385.

　　　　　On remand, Commerce concluded that "there [was] not substantial record evidence to conclude that the central government controlled Taifa's business decisions" and therefore, "assign[ed] Taifa a separated antidumping duty rate of 145.90 percent." Final Results of Redetermination Pursuant to Court Remand, 1–2 (Dep't Commerce Mar. 17, 2011) (Docket No. 145) ("Third Remand Results").[2] Taifa now challenges the 145.90% AFA rate as uncorroborated, punitive, aberrational, and an unexplained departure from Commerce's ordinary practice. See Taifa Cmts., 6, 16. In addition, intervenor defendants Gleason Industrial Products, Inc. ("Gleason") and Precision Products, Inc. ask the court to reconsider Taifa III, and in the alternative, affirm the Third Remand Results. See Gleason Cmts. 2, 5.

---

[2] In footnote one of the Third Remand Results, Commerce states it makes its determination under protest, but it does not indicate there as to which issue it believes it is compelled to act in a way it would not choose. See Third Remand Results, at 2 n.1. The court has not compelled a specific determination. It has ordered Commerce to explain its legal conclusions, support its factual conclusions and add evidence to the record or conduct further investigation, if necessary. See Taifa I, 637 F. Supp. 2d at 1244; Taifa II, 710 F. Supp. 2d at 1357; Taifa III, 760 F. Supp. 2d at 1385. Commerce appears to have made little effort to support its decision to calculate a separate rate for plaintiff and no effort to support a link to a PRC-wide rate. See Third Remand Results, at 6. It has devoted considerable effort, however, to its choice of a specific rate. See id. at 7–13. Whether substantial evidence supports that rate is the issue that the parties have substantively briefed and it is the issue that the court addresses here. See Qingdao Taifa Grp. Co., Ltd. Cmts. on the U.S. Department of Commerce's Final Results of Redetermination Pursuant to Court Remand Qingdao Taifa Grp. Co., Ltd v. United States Court No. 08-00245; Slip Op. 10-126 (CIT Nov. 12, 2010), 6–37 (Apr. 8, 2011) ("Taifa Cmts."); Cmts. on Final Results of Redetermination Pursuant to Court Third Remand, 5–9 (Apr. 8, 2011) ("Gleason Cmts.").

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will not uphold Commerce's final determination in an AD review if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

**DISCUSSION**

**I.   Commerce's Finding of No Central Government Control**

In its last opinion, the court remanded this case to Commerce with instructions to support its finding as to whether Taifa was state-controlled with substantial evidence.  See Taifa III, 760 F. Supp. 2d at 1385.  Upon reconsideration of the record evidence, Commerce concluded that "[a]lthough there is record evidence to demonstrate that Taifa is actually owned by the town government and there is reason to doubt the identity of an independent board of directors directing Taifa's activities in contradiction to how Taifa originally reported its ownership and management to the Department . . . there is insufficient record evidence to support a conclusion that Taifa operated under central government control."  Third Remand Results, at 6.  Although Gleason now asks the court to reconsider its earlier ruling on lack of evidence supporting central government control, no parties challenge Commerce's current determination on this issue as unsupported.  See Gleason Cmts., at 2–4; Taifa Cmts., at 4.

There is no statutory compulsion of a country-wide rate, and in this case the record shows no necessity for using such a rate.  But cf. Watanabe Grp. v. United States, Slip Op. 10-139, 2010 WL 5371606, *4–5 (CIT Dec. 22, 2010) (holding that Commerce may select the PRC-wide rate when it received no information, whatsoever, from respondent).  Whether or not

Commerce may in some cases choose this avenue as a permissible convenience or perhaps as an added deterrent does not give a petitioner a right to demand such a rate. A substantially supported rate is all the competitor may demand. See 19 U.S.C. § 1677e(b)-(c). Thus, as the court has not been presented a sufficient basis to revisit its holding in Taifa III, its discussion will be limited to the lawfulness of Taifa's separate rate.

    **II.**    **Taifa's Separate Rate**

In the case of such lack of connection to central government control, the court instructed Commerce to give Taifa its own separate rate. Taifa III, 760 F. Supp. 2d at 1385–86. In its Third Remand Results, Commerce calculated a separate AFA rate of 145.90% using a portion of Taifa's verified sales from the initial investigation. Third Remand Results, at 9. To calculate this margin, Commerce first generated a list of the hand truck models sold by Taifa, ranking them in order of highest to lowest model-specific margin. Id. at 9, 21. Commerce then used the quantity of each model sold to calculate the cumulative percentage each model represented of Taifa's total sales from the top down. Id. at 9. Finally, Commerce calculated the weighted-average margin of 145.90% using data from the sales of the three models with the highest margins, which accounted for 36% of Taifa's total sales by quantity. Id.

During an AD review, when "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority . . . the administering authority . . . may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b). Under these circumstances, the AD duty rate is known as an AFA rate and may be based on

information obtained from: "(1) the petition, (2) a final determination in the investigation under this subtitle, (3) any previous review under [19 U.S.C. § 1675] . . . or determination under [19 U.S.C. § 1675b] . . ., or (4) any other information placed on the record." Id. Nevertheless, "the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." F.lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000). Thus, Commerce's broad discretion under the statute is not without limitations. See PAM S.p.A. v. United States, 582 F.3d 1336, 1340 (Fed. Cir. 2009).

Taifa now challenges this AFA rate as uncorroborated, punitive, and aberrational. See Taifa Cmts., at 16. In addition, Taifa contends that Commerce's methodology unlawfully departed from its normal practice. Id. at 6. These claims lack merit.

### A.     Commerce Corroborated Taifa's AFA Rate

Pursuant to 19 U.S.C. § 1677e(c), "[w]hen the administering authority . . . relies on secondary information rather than on information obtained in the course of an investigation or review, the administering authority . . . shall, to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal." 19 U.S.C. § 1677e(c). Commerce, therefore, must corroborate Taifa's AFA rate because it was calculated using secondary information, namely, sales data from the previous investigation. See KYD, Inc. v. United States, 607 F.3d 760, 765 (Fed. Cir. 2010) (providing that "[s]econdary information includes [i]nformation derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under [19 U.S.C.

Court No. 08-00245                                                                                                    Page 8

§ 1675] concerning the subject merchandise" (internal quotation marks omitted)).

In order to corroborate an AFA rate, Commerce must show that it used "reliable facts" that had "some grounding in commercial reality." Gallant Ocean (Thai.) Co., Ltd. v. United States, 602 F.3d 1319, 1324 (Fed. Cir. 2010) (internal quotation marks omitted). On remand, Commerce reasoned that the 145.90% AFA rate was representative of Taifa's commercial reality because it was calculated using 36% of Taifa's verified sales data from the last time it was found to be cooperative, approximately two years earlier.[3] Third Remand Results, at 9. Commerce also concluded that this rate was corroborated because discredited margins calculated for the preliminary results exceeded this amount.[4] Id. at 13.

The court recognizes that there is no verified sales data on the record for the relevant period of review, as Taifa was the only respondent and it failed to cooperate. See

---

[3] For the purposes of the Final Results, the period of review was December 1, 2005, through November 30, 2006. 73 Fed. Reg. at 43,685. The verified data used to make this calculation was from sales made during the period of investigation, April 1, 2003 through September 30, 2003. Amended Final Determination of Sales at Less Than Fair Value: Hand Trucks and Certain Parts Thereof From the People's Republic of China, 69 Fed. Reg. 65,410, 65,411 (Dep't Commerce Nov. 12, 2004) ("Amended Final Determination").

[4] [[   ]] sales from the period of review, constituting [[   ]]% of total sales, were found to be dumped at transaction-specific margins exceeding 145.90%. Third Remand Results, at 13. The court notes that if this sales data had been verified, it likely would not be enough to corroborate an AFA rate so large. See Taifa III, 760 F. Supp. 2d at 1386 n.7 ("When rates are in multiples of 100%, one might assume that a bit more corroboration or record support is warranted."). Nevertheless, as Commerce points out, "Taifa withheld data and otherwise failed verification and the rates are likely significantly lower than they would be if Taifa had cooperated." Third Remand Results, at 13. The court has already found that Taifa failed to cooperate fully and its data was therefore unreliable. See Taifa III, 760 F. Supp. 2d at 1386. Thus, the current sales data provides little, if any, evidence of Taifa's actual commercial reality.

*Confidential Data Deleted*


Taifa III, 760 F. Supp. 2d at 1386; Third Remand Results, at 11. Under such circumstances, Commerce's corroboration may be less than ideal because the uncooperative acts of the respondent has deprived Commerce of the very information that it needs to link an AFA rate to commercial reality. See 19 U.S.C. § 1677e(c) (stating that Commerce must corroborate "to the extent practicable"); Gallant, 602 F.3d at 1324. Thus, Taifa's sales data from April 1, 2003 through September 30, 2003, may be used because it is the only verified sales data on record for this company and is not so outdated so as to compel its rejection on grounds of lack of relevance. Third Remand Results, at 9. Furthermore, 36% of sales by quantity from the previous investigation is a large enough proportion to demonstrate some form of a commercial reality when the record is otherwise barren.[5] Cf. Mid Continent Nail Corp. v. United States, 712 F. Supp. 2d 1370, 1378 (CIT 2010) (providing that, in the context of targeted dumping, 33% is considered reasonable for establishing a pattern of activity). Commerce, therefore, in this difficult circumstance has corroborated the selected AFA rate of 145.90% "to the extent practicable."[6] 19 U.S.C. § 1677e(c).

---

[5] Taifa argues that Commerce's use of 33% in other contexts is distinguishable. See Taifa's Cmts., at 21. The history of such a threshold does not determine whether or not there is evidence to establish Taifa's commercial reality in this context.

[6] The selected AFA rate of 145.90%, much like the previously proposed rate of 227.73%, is not an actual rate, but rather is calculated using a portion of Taifa's sales. Third Remand Results, at 9; see Taifa III, 760 F. Supp. 2d at 1386. This fact, however, does not automatically render the 145.90% unusable. Although some sources are generally better than others, there is no statutory provision that requires Commerce to select a preexisting rate. See PSC VSMPO-AVISMA Corp. v. United States, 755 F. Supp. 2d 1330, 1337 n.7 (CIT 2011). Rather, Commerce must be fair and reasonable. See F.lli De Cecco, 216 F.3d at 1032. If it has a viable rate that achieves statutory ends it should use it. See Taifa III, 760 F. Supp. 2d at 1386. If not, it will be forced to construct a rate. See PSC VSMPO-AVISMA, 755 F. Supp. 2d at 1337 n.7.
(continued...)

### B. The Selected AFA Rate is Not Punitive

Commerce cannot apply an AFA rate if it is punitive. F.lli De Cecco, 216 F.3d at 1032. An AFA rate is punitive if it is not "based on facts" and "has been discredited by the agency's own investigation." Id. at 1033. Taifa claims that the AFA rate of 145.90% is punitive because it is much higher than all other calculated company-specific rates in previous segments of the proceedings.[7] See Taifa Cmts., at 17. As the court has previously explained, however, except in some very odd situations not present here, "[i]f [a] rate is sufficiently corroborated as a reliable rate it will not be found to be punitive." PSC VSMPO-AVISMA, 755 F. Supp. 2d at 1337; see also Lifestyle Enter. v. United States, Slip Op. 11-16, 2011 Ct. Intl. Trade LEXIS 17, *20 n.13 (CIT Feb. 11, 2011) ("Although clearly distinct standards[, ] under Federal Circuit precedent, corroboration and reliability seem to collapse together in that they require demonstration of the same facts and legal conclusions.") Thus, the court does not find the AFA rate of 145.90% punitive for essentially the same reasons that it finds it is not uncorroborated.

### C. The Selected AFA Rate is Not Aberrational

Similarly, Taifa claims that the selected AFA rate is aberrational because it is

---

[6](...continued)
Commerce has broad discretion when selecting an AFA rate, including the ability to calculate a new percentage based on substantial evidence, so long as it is not "punitive, aberrational, or uncorroborated." F.lii De Cecco, 216 F.3d at 1032; see PAM S.p.A., 582 F.3d at 1340.

[7] The highest calculated company-specific rate from a previous segment of this proceeding is 46.48%. See Amended Final Determination, 69 Fed. Reg. at 65,411. The only calculated rate for Taifa is 26.49%. Id. The highest calculated company-specific rate from the immediately prior review is 17.59%. Hand Trucks and Certain Parts Thereof From the People's Republic of China: Final Results of Administrative Review and Final Results of New Shipper Review, 72 Fed. Reg. 27,287, 27,290 (Dep't Commerce May 15, 2007).

rebutted by the calculated company-specific rates in other segments of this proceeding. See Taifa's Cmts., at 25. In addition, Taifa claims that Commerce's methodology, which calculated the AFA rate using the 36% of Taifa's sales by quantity with the highest model-specific margins, impermissibly skews the result. Id. at 24. This is not a case, however, where Commerce is attempting to corroborate an AFA rate based on the existence of one irregular sale. See PSC VSMPO-AVISMA, 755 F. Supp. 2d at 1338. The fact that 36% of Taifa's sales by quantity yield this rate demonstrates that it is not so out of touch with Taifa's behavior as to render it aberrational.[8] The AFA rate of 145.90%, therefore, is not aberrational for essentially the same reasons that it is not uncorroborated.

### D.   Commerce's Methodology

Finally, Taifa contends that there was no justifiable basis for Commerce to depart from its normal practice of adopting the highest weighted-average margin calculated for any respondent in any previous segment of the proceeding. See Taifa Cmts., at 6–16. When making a discretionary determination, however, Commerce can use a case-by-case analysis, so long as it is "consistent with its statutory authority." See Allied-Signal Aerospace Co. v. United States, 28

---

[8] Taifa's attempt to analogize the facts of this case with those of Gallant in order to achieve a similar result is misplaced. See Taifa Cmts., at 23. In Gallant, Commerce selected a petition rate that was later discredited by its own investigation. Gallant, 602 F.3d at 1323. Here, Commerce lacks the type of verified data that it had in Gallant. See supra note 4. For this reason, whatever rate Commerce calculated for Taifa in the preliminary results is irrelevant. Furthermore, the interpretation of Gallant that Taifa proposes, that a court can determine whether a rate is aberrational or not by simply comparing it to other calculated rates, is an oversimplification of that case. See Gallant, 602 F.3d at 1324 (reasoning that "[b]ecause Commerce did not identify any relationship between the small number of unusually high dumping transactions with Gallant's actual rate, those transactions cannot corroborate the adjusted petition rate").


F.3d 1188, 1191 (Fed. Cir. 1994). Under such circumstances, Commerce is not required to justify its determination in terms of past alternatives. See id. Of course, Commerce must always act reasonably. See id. Here, the reasoning of Commerce's methodology is clear and simple: Commerce lacked credible data for sales made during the period of review. See Third Remand Results, at 13. Commerce then used a substantial portion of Taifa's sales from the original investigation, Taifa's only verified data, to calculate a rate. Third Remand Results, at 9. This methodology is reasonable considering Taifa's lack of verified sales data, the percentage of sales used, and the relatively recent nature of the sales when compared to the time period of the review. Commerce's methodology, therefore, is reasonable and not contrary to law.

## CONCLUSION

For the foregoing reasons, Commerce's determinations are supported by substantial evidence and are in accordance with the law. Accordingly, the Third Remand Results are sustained.

                                                                                    /s/ Jane A. Restani
                                                                                    Jane A. Restani
                                                                                         Judge

Dated: This 12th day of July, 2011.
           New York, New York.

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| QINGDAO TAIFA GROUP CO., LTD., : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> UNITED STATES, : <br> : <br> Defendant, : <br> : <br> and : <br> : <br> GLEASON INDUSTRIAL PRODUCTS, INC. : <br> and PRECISION PRODUCTS, INC., : <br> : <br> Intervenor Defendants. : | Before: Jane A. Restani, Judge <br><br> Court No. 08-00245 |

## **JUDGMENT**

The determination on remand of the United States Department of Commerce in this action is hereby sustained and in accordance with 19 U.S.C. § 1516a(e), liquidation of any entries heretofore enjoined in this action shall be liquidated only in accordance with the final results of this litigation, including any and all appeals.

                                                                                           /s/ Jane A. Restani  
                                                                                                 Jane A. Restani  
                                                                                                       Judge

Dated: This 12th day of July, 2011.  
      New York, New York.